UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHRYN KERR,

        Plaintiff,                    Civil Action No. 12-cv-10119

     v.                       District Judge Mark A. Goldsmith
                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13] AND**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]**

Plaintiff Kathryn Kerr appeals Defendant Commissioner of Social Security's denial of her applications for period of disability and disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.; Transcript ("Tr.") 22.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 13, 18). For the reasons set forth below, this Court finds that the ALJ, while providing a comprehensive summary of the medical evidence, did not adequately explain why he rejected potentially dispositive functional limitations offered by Plaintiff's treating physician and that a number of the ALJ's reasons for discounting Plaintiff's testimony do not, in fact, undermine her testimony. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 18) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Ms. Kerr was 45 years old on the date she alleges she became disabled.  (*See* Tr. 22, 199.)  She has a high-school education.  (Tr. 68.)  Plaintiff maintains that neck and wrist pain, numbness in her hands, and mental impairments prevent her from work.  (*See* Tr. 55-56, 61, 70-71.)

### A.  Procedural History

On February 13, 2009, Plaintiff applied for period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting that she became unable to work on March 24, 2008.  (Tr. 22.)  The Commissioner initially denied these applications on June 16, 2009.  (Tr. 22.)  Plaintiff then requested an administrative hearing, and, on April 20, 2010, she appeared with counsel before Administrative Law Judge Stanley M. Schwartz, who considered her case *de novo*.  (*See* Tr. 44-80.)  At the hearing, Plaintiff amended her alleged disability onset date to June 8, 2007.  (Tr. 22.)  In a June 25, 2010 decision, ALJ Schwartz found that Plaintiff was not disabled.  (*See* Tr. 22-37.)  His decision became the final decision of the Commissioner of Social Security ("Commissioner") on November 15, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on January 11, 2012.  (Dkt. 1, Compl.)

### B.  Medical Evidence

In March 2007, Plaintiff discovered a mass in her left breast.  (Tr. 298, 560.)  A biopsy revealed stage II left breast cancer.  (Tr. 365-371, 581.)  On June 8, 2007, Plaintiff underwent a bilateral mastectomy.  (Tr. 395-99; *see also* Tr. 560-61.)  Days later, Plaintiff returned to the surgical oncology clinic "for a wound recheck and emotional support": Plaintiff was very upset that, just days after her surgery, her husband had asked for a divorce.  (Tr. 400; *see also* Tr. 932, 928.)

2

In July 2007, Plaintiff began seeing Dr. Carol E. Peterson, an oncologist. (Tr. 291-92.) Dr. Peterson planned to begin chemotherapy. (Tr. 291-92; *see also* Tr. 289, 815.)

In early August 2007, Plaintiff was hospitalized for pulmonary emboli in her right lung. (Tr. 282-86; 525-26.) Two days after discharge, Plaintiff saw Dr. Peterson for right-sided chest pain; Dr. Peterson noted that Plaintiff was "crying and hysterical again." (Tr. 280.) Dr. Peterson prescribed pain medication, including Vicodin, and Coumadin, a medication for blood clots. (Tr. 280.)

Later in August 2007, Plaintiff was hospitalized for dehydration. (Tr. 500-01.) During her stay, Plaintiff reported right-shoulder pain. (Tr. 500.) Imaging studies of Plaintiff's right shoulder revealed "mild hypertrophic degenerative bony changes," but no acute abnormality. (Tr. 382.)

Plaintiff was "distraught" and kept "sobbing and crying" during her December 5, 2007 visit with Dr. Peterson. (Tr. 261.) Plaintiff reported that she was losing her house and her husband's children and indicated that she would not finish her chemotherapy. (Tr. 261.) Dr. Peterson attempted to get Plaintiff to call a mental-health clinic. (*Id.*) Physically, Plaintiff reported numbness in her fingers and toes, which Dr. Peterson attributed to the chemotherapy treatment. (*Id.*)

On January 10, 2008, Plaintiff reported to Dr. Peterson that she continued to have a lot of chest pain since her surgery. (Tr. 256.) Plaintiff provided, however, that she had been doing physical therapy on her own, and that, as a result, she could raise her arm. (Tr. 256.) Plaintiff reported muscle aches from the chemotherapy treatment. (*Id.*)

On January 24, 2008, Plaintiff was "constantly weeping" at her chemotherapy appointment. (Tr. 253.) Dr. Peterson's office referred Plaintiff to a mental-health clinic, and Plaintiff indicated that she would go to the clinic. (*Id.*) At her next chemotherapy appointment Plaintiff reported

feeling better overall. (Tr. 251.) She had not, however, gone to the mental-health clinic for fear of losing her children. (*Id.*)

In March 2008, Plaintiff saw Dr. Peterson again, but this time for severe right-arm pain extending to the right upper chest and back. (Tr. 248.) Cervical spine MRIs showed a "moderate to large size central disc herniation contribut[ing] to rather severe degenerative central canal stenosis" at C4-C5, a "moderate to large size . . . disc herniation causing rather severe central canal stenosis . . . and encroaching [on] the left C5-C6 neural foramen," and a moderate sized disc herniation at C6-C7 causing "mild cord compression," which also appeared to encroach the right C6-C7 neural foramen. (Tr. 469.)[1]

On April 15, 2008, Plaintiff reported to Dr. Peterson that she had significant pain and numbness in her right arm, shoulder, upper chest, and back. (Tr. 246.) Dr. Peterson remarked that Plaintiff's "MRI did not look good" and that she had "significant disease with pressure on the spine from disc problems in the lower cervical spine." (Tr. 246.) The next month, Dr. Peterson opined that Plaintiff would "probably" need surgery. (Tr. 245.)

On April 17, 2008, Plaintiff saw Physician Assistant Kathi Beck and Dr. Harrison Johnson at Shoreline Neurosurgical Consulting Brain and Spine Center. (Tr. 463-66; *see also* Tr. 227-31.) Plaintiff said that on March 24, 2008, she woke up with numbness on the right side of her body and

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. The *central canal* of the spinal column conveys the spinal cord. At each disc level, e.g., C6-C7, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs. Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, Lumbar Spinal Stenosis: Diagnosis and Treatment Options (June 1999); The Cleveland Clinic, Lumbar Canal Stenosis, http://my.clevelandclinic.org/disorders/stenosis_spinal/hic_lumbar_canal_stenosis.aspx (visited May 22, 2012); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, Herniated Disk, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (visited May 23, 2012).

trouble raising her right arm, turning a page in a book, or gripping a razor. (Tr. 463.) She reported that her pain was at the eight out of ten level. (Tr. 463.) On exam, Plaintiff had a decreased range of motion in her right upper extremity. (Tr. 464.) Ms. Beck and Dr. Harrison reviewed Plaintiff's MRIs and diagnosed cervicalgia and right cervical radicular pain. (*Id.*) They also diagnosed "probable neuropathic pain" related to Plaintiff's chemotherapy. (*Id.*) They recommended an EMG, physical therapy, an increase in medication, and possible cervical steroid injections when Plaintiff was no longer taking Coumadin. (*Id.*)

In the spring and summer of 2008, Plaintiff saw Dr. Glenn C. Griffiths. (Tr. 433-34.) In April 2008, Plaintiff presented with neck pain and requested a referral to a neurosurgeon. (Tr. 433.) Dr. Griffiths noted that Plaintiff was in "acute distress (very tearful and concerned about surgery recommended by her oncologist . . . .)." (*Id.*) Dr. Griffiths prescribed several medications and referred Plaintiff to a neurosurgeon. (*Id.*) In June 2008, Plaintiff also went to the emergency room for chest and back pain after sleeping on a hard jail-cell floor (apparently, Plaintiff had been arrested for an old violation). (Tr. 449.) Later that month, Plaintiff indicated that her pain was seven out of ten at rest, but ten out of ten with activity. (Tr. 448.)

In the fall of 2008, Plaintiff began treating with Dr. Michelle Rabideau, a family practice physician. (*See* Tr. 922-24.) In November 2008, Plaintiff reported that her neck pain was worse and that she had pain in her hand. (Tr. 914.) Plaintiff was then working 35 hours per week at a grocery store: she worked two days as a cashier and the remainder of the time in the cash office. (*Id.*; *see also* Tr. 190.) Plaintiff reported severe pain at the end of her two cashier days. (Tr. 914.) Dr. Rabideau diagnosed Plaintiff with chronic neck pain with radiculopathy and referred Plaintiff to the University of Michigan Spine Clinic for steroid injections. (*Id.*; *see also* Tr. 907.) Dr. Rabideau

also prescribed Dilaudid and Norco, narcotic pain medications, and restarted Plaintiff on an antidepressant. (Tr. 914-15.)

In December 2008, Plaintiff went to the emergency room for dehydration; she also reported pain in right upper arm and hand numbness. (Tr. 909.) Plaintiff was also upset that her brother had just passed away and "alternated between hostile behavior and verbal attacks and crying profusely and expressing hopelessness." (Tr. 911.) An attending physician diagnosed chronic cervical pain in both upper extremities and suspected left sided carpel tunnel syndrome or left-arm hyperalgesia (increased sensitivity to pain). (Tr. 409.) At her follow-up with Dr. Rabideau, Plaintiff became tearful and noted, "the worse news I ever got was that I was cured from my breast cancer. I have all these side effects left from the chemo and [no one] knows what to do with me." (Tr. 907.) Dr. Rabideau refilled Plaintiff's pain medications and rescheduled the appointment with the University of Michigan Spine Clinic. (*Id.*)

In January 2009, Plaintiff saw Dr. Rabideau for medication refills and for wrist pain. (Tr. 905.) Plaintiff was still working at the grocery store. (*Id.*; *see also* Tr. 190.) Dr. Rabideau renewed Plaintiff's pain medications (Dilaudid and Norco). (Tr. 905.) Although Dr. Rabideau believed that the source of Plaintiff's wrist pain was muscular, she ordered wrist x-rays. (*Id.*) The x-rays showed no acute fracture or degenerative changes. (Tr. 410.)

The next month, Plaintiff had a follow-up with Dr. Rabideau for chronic neck and arm pain. (Tr. 410.) Plaintiff reported that her wrist pain was so severe that she had lost her job. (*Id.*) (Plaintiff, however, would later tell a social worker that she had been fired for stealing. (Tr. 682.)) On exam, Plaintiff's wrists did not have swelling or bruising but were tender. (Tr. 410.) Dr. Rabideau found no neuropathy in Plaintiff's arms. (*Id.*) Dr. Rabideau ordered CT scans of both

6

wrists.  (*Id.*)

On March 4, 2009, Plaintiff saw Dr. Anthony Chiodo at the University of Michigan Spine Clinic.  (Tr. 900-02.)  Plaintiff reported paresthesia along her right inner arm and hand, pain radiating from her right neck down to her right hand, and pain in her left wrist along the thumb.  (Tr. 900.)  Plaintiff reported complete loss of sensation in one half of her right hand and decreased sensation in the other half.  (Tr. 901.)  She did not report loss of sensation in the left upper extremity, however.  (*Id.*)  Dr. Chiodo ordered an EMG.  (*Id.*)

A few days after her visit with Dr. Chiodo, Plaintiff went to the emergency room for narcotic pain-medication withdrawal.  (Tr. 897-99.)  Apparently, after taking prednisone that Dr. Chiodo had prescribed, Plaintiff noticed such a marked improvement in her symptoms that she flushed all of her narcotic medications.  (Tr. 895.)

At an April 2009 follow-up with Dr. Rabideau, Plaintiff reported feeling very anxious and depressed, and stated that she did not know what she would do once she was evicted from her home.  (Tr. 895.)  Dr. Rabideau increased Plaintiff's anti-depressant dosage, refilled her pain medication, and encouraged Plaintiff to seek a psychiatric referral.  (*Id.*)

Plaintiff also had a follow-up with Dr. Chiodo in April 2009; she reported that while prednisone initially resolved her symptoms, they had returned within a week.  (Tr. 893.)  Dr. Chiodo noted that the EMG showed evidence of carpal tunnel syndrome, greater on the right than the left.  (*Id.*)  His impression was carpal tunnel syndrome and de Quervain's tenosynovitis (a painful condition that affects tendons on the thumb side of the wrist).  (*Id.*)  He prescribed wrist splints and physical therapy.  (*Id.*)

In June 2009, Plaintiff had a follow-up visit with Dr. Rabideau for bilateral wrist pain.  (Tr.

888.) Plaintiff indicated that her pain had improved some, but was still present. (*Id.*) Dr. Rabideau noted that Plaintiff was staying with a friend and that her affect was "brighter than before, but still she is tearful at points in the interview." (*Id.*) Dr. Rabideau refilled Plaintiff's narcotic medications and continued Plaintiff on her antidepressant. (*Id.*)

Plaintiff was evicted later in June 2009, and, while spending the night in a park, her medications were stolen. (*Id.*) Plaintiff first went to a shelter where she tested positive for marijuana. (*Id.*) Plaintiff later went to the emergency-room for opiate (narcotic) withdrawal. (Tr. 980-83.)

On July 2, 2009, Plaintiff saw Dr. Joel Howell and Dr. Wissam Abdallah at University of Michigan's General Medicine Clinic. (Tr. 881.) On exam, the physicians found that Plaintiff had tenderness to palpation along both wrists and that sensation was diminished "along the median nerve of both upper extremities." (Tr. 882.) Plaintiff admitted that she had been abusing her narcotic medications since April. (Tr. 881.) Dr. Howell and Abdallah believed that taking Dilaudid and Norco on a repeated basis was not appropriate for controlling Plaintiff's neck and wrist pain. (Tr. 882.) The physicians instead prescribed Cymbalta and a lidocaine patch. (*Id.*)

On July 20, 2009, Plaintiff saw Dr. Rodney Hayward and Dr. Abdallah at the General Medicine Clinic. (Tr. 876-77.) Plaintiff indicated that she felt well, and, while continuing to report some right-wrist pain, she stated that her back pain and left-wrist pain had almost resolved. (Tr. 876.) The physicians noted that Plaintiff had been exercising and become "very physically active" while staying at a treatment facility. (*Id.*) They referred Plaintiff to orthopedic surgery to consider a carpal tunnel release. (Tr. 877.)

About a week later, on July 28, 2009, Plaintiff had a visit with Dr. Patrick Gibbons, a

psychiatrist.  (Tr. 994-96.)  Plaintiff was somewhat surprised that her chronic pain had resolved to the point where she was not using any analgesics.  (Tr. 994.)  Plaintiff also told Dr. Gibbons that her mood was "good most of the time, but I cry easily and I am very, very sensitive."  (*Id.*)  Dr. Gibbons noted that Plaintiff was mildly dysphoric/labile.  (Tr. 995.)  He diagnosed depressive disorder, not otherwise specified, and indicated a rule-out diagnosis of bipolar spectrum disorder.  (Tr. 995.)

In September 2009, Plaintiff had a follow-up visit with Drs. Hayward and Abdallah.  (Tr. 864-66.)  Plaintiff had been residing at a shelter but was applying for jobs.  (Tr. 864; *see also* Tr. 631-70.)  Although Plaintiff had gained 20 pounds because of poor dietary options at the shelter, she reported walking on a daily basis and said she would soon start swimming at the YMCA.  (Tr. 864.)  Drs. Hayward and Abdallah noted that Plaintiff's Cymbalta prescription for depression was also likely helping her neuropathic pain.  (Tr. 865.)  For Plaintiff's wrist pain, they provided referrals to orthopedic surgery and physical medicine and rehabilitation.  (*Id.*)

In late October 2009, Plaintiff was treated at the shelter for sharp chest pain; although Plaintiff had been swimming and lifting weights regularly, she experienced pain when attempting to carry a heavy bag.  (Tr. 637.)

Plaintiff also saw Dr. Gibbons in October 2009.  (Tr. 992-93.)  Plaintiff described her mood as "pretty good" and provided that her depression was well-controlled.  (Tr. 992.)

In January 2010, Plaintiff began substance abuse and mental-health treatment at Home of New Vision.  (Tr. 680.)  On January 20, 2010, Dr. Leon Quinn, a psychiatrist at Home of New Vision, evaluated Plaintiff.  (Tr. 676-78.)  Dr. Quinn diagnosed opiate and marijuana dependence (Plaintiff, however, had not taken drugs since June 2009 (Tr. 683-84)), and depressive disorder, not otherwise specified.  (Tr. 678.)  The next month, having seen Plaintiff only once, Dr. Quinn

completed a Mental Residual Functional Capacity Assessment. (Tr. 671; *see also* Tr. 673.) He provided that Plaintiff had no or slight limitations in the majority of the listed work-related tasks, including, remembering locations and work-like procedures and understanding, remembering, and carrying out short and simple repetitive instructions or tasks. (Tr. 671.) He also indicated, however, that Plaintiff had a number of moderate limitations in a number of areas, including, her ability to maintain concentration for at least two straight hours with at least four such sessions in a workday and her ability to respond appropriately to unexpected changes in the work setting. (Tr. 672.) Dr. Quinn provided that a routine, repetitive, simple, entry-level job would "deflate [Ms. Kerr's] self esteem further." (Tr. 673.)

In February 2010, Plaintiff reported to Drs. Hayward and Abdallah that she had been experiencing chest pain two to three times per week, with each episode lasting up to a minute. (Tr. 845.) The physicians believed that the pain was most likely attributable to scar tissue from Plaintiff's mastectomy. (*Id.*) Drs. Hayward and Abdallah provided that Plaintiff was still "very physically active" and that Plaintiff's depression symptoms appeared to be stable. (*Id.*)

In April 2010, Dr. Abdallah evaluated Plaintiff's functional limitations. (Tr. 627.) He diagnosed a history of breast cancer status-post mastectomy and chemotherapy, bilateral carpal tunnel syndrome, depression, and chronic chest wall pain secondary to scar tissue. (Tr. 627.) Dr. Abdallah provided that Plaintiff could stand or walk four hours in an eight-hour day and sit for eight hours in an eight-hour day. (Tr. 628.) Dr. Abdallah opined that Plaintiff would likely be absent from work more than four times per month because of her impairments or medical treatment. (Tr. 630.) Most relevant for the present appeal, Dr. Abdallah provided that, even on an "occasional[]" basis (up to 1/3 of the workday), Plaintiff could lift and carry only 10 pounds, she had "limited

10

ability to perform repetitive types of work due to carpal tunnel syndrome," and she could "never" engage in tasks requiring feeling.  (Tr. 628, 630.)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

At her administrative hearing before ALJ Schwartz, Plaintiff testified about how her hands limited her ability to work.  Plaintiff testified that she had "double carpal tunnel syndrome" and that, since her chemotherapy treatment, she had "no feeling in either of her hands."  (Tr. 53.)  Plaintiff said that an oncologist told her that it was unlikely that feeling would ever return to her hands.  (Tr. 55.)  Plaintiff told the ALJ that her inability to feel prevented her from doing everyday tasks such as tying her shoes, buttoning a shirt, typing on a keyboard, or using a sharp knife to prepare meals. (Tr. 56, 62.)  She further explained, "[I] [c]an't wash dishes because I will either grasp a glass [so] hard that it breaks, or I'm not grasping it hard enough and it slips out of my hand and breaks."  (Tr. 62.)

Plaintiff also testified to cervical disc problems.  (Tr. 71.)  She explained that she did not drive because she could not turn her head all the way.  (*Id.*)  She also said she could only read for an hour before she was in "so much pain" that she had to stop.  (*Id.*)

Plaintiff further testified to severe pain.  Plaintiff stated, "The pain is so intense sometimes that I am completely distracted."  (Tr. 56.)  She explained that her pain affected her ability to volunteer at a community garden: "[I] [b]end down to do something and the pain is so intense I'll just even forget what I was attempting to do."  (*Id.*)  Plaintiff also said, however, "[on good days] the pain is minimal[,] I should say tolerable.  On a good day for me I will actually be able to go to the [YMCA].  I have a membership at the Y so that I can swim. . . . [O]n a good day I can actually

get into my bathing suit without a help." (Tr. 63.)  In contrast, Plaintiff explained, "[a] bad day for me, I wake up in pain.  I go to bed in pain." (*Id.*)  Plaintiff said her pain was nine out of ten on a bad day and six or seven out of ten on an average day.  (Tr. 64.)

In terms of her mental functioning, Plaintiff testified, "I'm obviously a lot more emotional than I used to be.  I always considered myself an extremely intelligent person, or at least a fairly intelligent person.  I react more emotionally to everything.  And I think that I don't know why[.] . . . I'm in therapy, and I'm trying to figure out why." (Tr. 57.)

As for her activities of daily living, Plaintiff testified that she worked at a parking company 12 to 16 hours per week.  (Tr. 66-67.)  Plaintiff said that while she was considered a "cashier," she did not handle money because her fingers would not allow her to pull the bills apart.  (Tr. 66.)  She explained that her primary task was visual inspection: "[I] [m]ake sure the car pulling into the lot has the correct parking permit." (*Id.*)  Plaintiff said she worked four-hour shifts and that, after four hours, she "need[ed] to go home and lay flat." (Tr. 67.)  Plaintiff also said she could lift a "couple of pounds" "occasionally" and that she had been instructed to not lift more than eight or nine pounds.  (Tr. 61.)  She explained that lifting her purse caused pain in her wrists.  (*Id.*)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine what types of jobs would be available for various hypothetical individuals.  The ALJ first asked the VE about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of "light work" (which requires lifting 20 pounds "occasionally," and 10 pounds "frequently") and frequent reaching, gripping, and handling, but had no feeling in the hands.  (Tr. 74.)  The VE testified that the individual could work a number of "light," "unskilled" jobs,

12

including, laundry folder, fast-food worker, and parking-lot cashier.  (*Id.*)  The VE said that there

were 5,500, 80,000, and 3,000 such jobs in Michigan, respectively.  (*Id.*)

The ALJ next asked the VE about a second hypothetical individual, the same as the first,

except that the individual could lift only ten pounds.  (Tr. 74-75.)  The VE indicated that this added

limitation would place the individual at the "sedentary" level.  (Tr. 75.)  The ALJ continued, "And

what if she had no feeling at the sedentary level? . . . [W]ould she be able to perform any type of

work?"  (*Id.*)  The VE responded, "No."

After asking other hypotheticals, the ALJ asked the VE about an individual who could "stand

at least four hours, sit at least four hours, and could lift 20 pounds occasionally and 10 pounds

frequently" who was also limited to simple, one and two step tasks.  (Tr. 75-76.)  The VE testified

that this hypothetical individual could not perform the fast-food job, but could perform the laundry

folder and parking-lot cashier positions.  (Tr. 76.)

## II.  THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage

earners who become disabled prior to expiration of their insured status) and Supplemental Security

Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727,

730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

13

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

See 20 C.F.R. §§ 404.1520, 416.920; see also Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]."  Preslar v. Sec'y of Health and Human Servs., 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Schwartz found that Plaintiff had not engaged in substantial gainful activity since her amended alleged disability onset date of June 8, 2007. (Tr. 24.)  At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine with wrist pain and paresthesias in the right and left fingers, affective disorder and history of substance abuse.  (Id.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 30-32.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

lift, carry, push and pull 20 pounds occasionally and 10 pounds

14

> frequently as well as stand and/or walk 4 hours out of an 8-hour workday and sit 6 hours out of an 8-hour workday. The claimant['s] ability to perform the full range of light work . . . is reduced by [the] inability to understand, remember and carry out more than simple, repetitive tasks.

(Tr. 32.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 35.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 35-36.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 36.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)

15

(en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff raises three claims of error. She says that the ALJ erred in applying the treating-source rule to the opinions of Drs. Abdallah and Quinn. (Pl.'s Mot. Summ. J. at 4-9.) Plaintiff also claims that the ALJ failed to "articulate how [the medical] evidence supported his [residual functional capacity] determination." (*Id.* at 10; *see also id.* at 10-11.) Finally, Plaintiff claims that the ALJ erred in discounting her testimony. (*Id.* at 11-12.) The Court considers these claims of error in turn.

### A. The ALJ Did Not Adequately Explain Why He Rejected Dr. Abdallah's Lifting and Feeling Limitations

Plaintiff's primary argument is that the ALJ "rejected the majority of Dr. Abd[a]llah's opinion" without providing "good reasons" for doing so. (Pl.'s Mot. Summ. J. at 5.) The

16

Commissioner responds in part by pointing out that the ALJ provided a "painstaking summary of the medical and testimony evidence." (Def.'s Mot. for Summ. J. at 8.) This is true. But a fact summary, no matter how detailed, is not analysis. The latter is what is critical, and, while close, this Court agrees with Plaintiff that the ALJ's treating-source analysis is deficient.

Under the treating source rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)). And if the ALJ finds that a treating physician's opinion is not entitled to "controlling weight," the opinion is still generally entitled to "great deference," *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009), and the ALJ must apply a non-exhaustive list of factors to determine how much weight to give the opinion, 20 C.F.R. § 404.1527(c).

More critical for present purposes, however, is the requirement that an ALJ give "good reasons" for the weight he assigns a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record"). The purpose for this procedural requirement is three-fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *5. The Court emphasizes that this procedural right is substantial: abridgement warrants remand even when substantial evidence supports the ALJ's ultimate disability determination. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining *precisely* how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." (emphasis added)).

After summarizing Dr. Abdallah's (and Dr. Quinn's) opinions, the ALJ provided the following reasons for discounting them:

> A treating physician's opinions are generally entitled to controlling weight when well supported and not inconsistent with the other substantial evidence in the record. I note that the claimant is clearly capable of performing an entry level, simple job as she is currently performing just such a job, although not at the substantial gainful activity level and therefore not past relevant work, presently without difficulty. Exhibit 10F/7. The claimant has stated that she takes public transportation to get to her job. She denies that she would have any problem interacting with supervisors or coworkers. There is also no indication from the record that the claimant would require a 20 minute break every hour or that she would miss four or more days from work each month as found by Dr. Abd[a]llah. The claimant swims regularly at the YMCA, works in a communal garden and walks for exercise. She has also actively sought employment and has worked at several jobs. Moreover, the determination of claimant's disability is a medical source treatment [*sic*] which is reserved to the Commissioner and, though a treating physician's opinion on any issue must be considered, such a determination is never entitled to controlling weight or special significance (20 CFR 404.l527(e) (1) and 416.927 (e) (1); Social Security Ruling 96-2p and Social Security Ruling 96-5).

(Tr. 34-35.)

The foregoing passage makes plain that the ALJ never explicitly assigned a weight to Dr.

18

Abdallah's opinion.  (*See* Tr. 34-35.)  This alone gives the Court reason to question whether the ALJ fully complied with the treating-source rule.  *See* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that an unfavorable disability decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion").  And even assuming that the Court — and Plaintiff — can readily infer that the ALJ gave Dr. Abdallah's opinion "little" weight, the more fundamental question remains: whether the ALJ provided the requisite "good reasons" for doing so.

Plaintiff says that the ALJ did not give "good reasons" for rejecting Dr. Abdallah's findings that she could not feel or lift more than 10 pounds "occasionally."  (*See* Tr. 628-29.)  While Plaintiff cites no case law requiring an ALJ to engage in the time-consuming task of individually addressing each limitation in every treating-source opinion, a number of factors make this omitted analysis important.  For one, the ALJ was specifically informed that Dr. Abdallah's lifting and feeling limitations were dispositive of the disability inquiry:

> [ALJ]  Now, if we limited her to 10 pounds lifting, that would erode those jobs?  Or —
> [VE]  Yes, Judge.
> Q  What about, then, what do we have her at?  The sedentary level?
> A  Yes, Judge.
> Q  And what about if she had no feeling at the sedentary level?  Would she still be able to — would she be able to perform any type of work?
> A  No.

(Tr. 75.)  Second, the ALJ apparently adopted, or at least agreed with, Dr. Abdallah's limitation on standing: both the ALJ's RFC assessment and Dr. Abdallah's opinion provide that Plaintiff can stand for only four hours in an eight-hour day (instead of the six hours associated with light work or the two hours for sedentary work).  (*Compare* Tr. 32 *with* Tr. 628); *see also* S.S.R. 83-10, 1983 WL

31251, at *5-6.  Third, the record contained only one "acceptable medical source" opinion on Plaintiff's physical limitations. *See* 20 C.F.R. § 416.913; S.S.R. 96-2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").  Given that the ALJ knew that crediting Dr. Abdallah's lifting and feeling limitations would be determinative, that the ALJ did not explicitly assign a weight to Dr. Abdallah's opinion and agreed with at least one of his limitations, and that no other physician offered an opinion on Plaintiff's physical limitations, the ALJ should have provided a specific explanation for why he deemed Dr. Abdallah's lifting and feeling limitations incredible.

Yet, he did not provide one.  The ALJ first discounted Dr. Abdallah's opinion because Plaintiff was "clearly capable of performing an entry level simple job as she is currently performing just such a job," because she took "public transportation to get to her job," and because she denied having "any problem interacting with supervisors or coworkers."  (Tr. 34-35.)  None of these are a good reason for rejecting a 10-pound lifting limitation or a restriction from tasks requiring feeling. Plaintiff provided the only description of her then-current work.  She explained that she did not handle money because her fingers (presumably her lack of feeling) would not allow her to pull bills apart.  (*See* Tr. 66.)  Plaintiff emphasized that her job was "mostly visual" and that she "look[s] with [her] eyes" to determine if vehicles have the proper permits.  (*Id.*)  Plaintiff also told the ALJ that she was aided by a woman who stood next to her and handed out tickets and collected money.  (*Id.*) Therefore, the fact that Plaintiff was working an "entry level, simple job" at the time of the hearing says little, if anything, about her ability to lift or feel.  The same applies for riding public transportation.  (*See* Tr. 67.)  As for the ALJ's social-interaction rationale, that statement is

obviously directed to Dr. Quinn's mental-functioning opinion.

The ALJ also reasoned, "The claimant swims regularly at the YMCA, works in a communal garden and walks for exercise." (Tr. 35.) The fact that Plaintiff engages in rehabilitative swimming (on her good days when she can get into her bathing suit) says little about whether she can lift 20 pounds occasionally (i.e., for up to 1/3 of a workday) and 10 pounds frequently (i.e., for up to 2/3 of a workday) five days a week. Plaintiff's ability to walk for exercise undermines neither the lifting or feeling limitation. As for the communal garden, to the extent that the ALJ relied on Plaintiff's description about her participation, it was incumbent upon him to also account for her testified-to qualifications:

> On a bad day, I will go to the garden, and I will walk around, and I will give instruction. But I can't bend down. I can't. It's hard for me to pull weeds, you know, things like that. *I can't grasp anything. I have no feeling at all.* . . . On a bad day, I'll be out in the garden for maybe 15 or 20 minutes before I go back and sit in the driver's van. On a good day I'm out there for the whole hour. But for me, I can't bend down, get up, bend down, get up. I bend down, I stay down there for that amount of time. When I go to get up I need assistance getting up. . . .

(Tr. 65 (emphasis added).) Plaintiff never testified to lifting more than 10 pounds — for up to 1/3 of an eight-hour day — at the communal garden. Nor did she ever say that she engaged in tasks that required her to feel.

The ALJ further reasoned that "[Plaintiff] has . . . actively sought employment and has worked at several jobs." (Tr. 35.) Plaintiff's job as a parking attendant has already been discussed. As for her work as a cashier, it is true that she worked in that position during the disability period. But she only worked two days a week in that position, and, even then, Plaintiff explained,

> the pain in my wrists and the limited mobility of my hands even, you know, just being a cashier, made that very difficult . . . reaching for

21

> items on the conveyor belt. . . .  [A] lot of people buy heavy items.
> And now-a-days it's an electronic scan.  You have to scan it.  And
> my wrists can't support a lot of the items.  I mean, I was having
> difficulty in that.

(Tr. 66, 914.)  More importantly, Dr. Abdallah provided that his opinion was limited to Plaintiff's

functional abilities after July 2, 2009.  (Tr. 627.)  By that time, Plaintiff had stopped working as a

cashier.  (Tr. 190, 410, 905.)

The ALJ further found that "[t]here [was] . . . no indication from the record that the claimant

would require a 20 minute break every hour or that she would miss four or more days from work

each month as found by Dr. Abd[a]llah."  (Tr. 35.)  Although this statement informs both Plaintiff

and the Court why the ALJ rejected two of Dr. Abdallah's findings, it says nothing about why the

ALJ believed Dr. Abdallah's lifting and feeling limitations were incredible.  When some treating-

source findings are not supported by the record, it is not a necessary corollary that others are

similarly unsupported.  *Cf. Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) ("[I]f

a treating source's opinion is so patently deficient that the Commissioner could not possibly credit

it, a failure to observe § 1527[(c)](2) may not warrant reversal.").  If the ALJ believed this was the

case, or believed that because two of Dr. Abdallah's findings were unsupported, his entire opinion

was not credible, the ALJ should have explicitly said so — and explained why.

The Commissioner responds that Plaintiff is  reading the ALJ's decision "too narrowly":

> [i]t is clear from reading the opinion as a whole, that by finding
> Plaintiff could perform light work, the ALJ did not adopt the
> 10-pound lifting restriction because the record did not support such
> an extreme restriction, just as it did not support Dr. Abd[a]llah's
> conclusions regarding Plaintiff's need for rest or propensity to miss
> work.   Any other reading of the ALJ's decision defies logic,
> particularly given the ALJ's painstaking summary of the medical and
> testimonial evidence that supported his finding that Plaintiff was
> capable of gainful activity.  The logic of the ALJ's decision is both

> clear and reasonable: Plaintiff's robust activities, together with the
> medical evidence of reduced pain and other medical improvement,
> supported a finding of no disability.

(Def.'s Mot. Summ. J. at 8.)

But the Commissioner is reading the decision too broadly. The Court disagrees with the Commissioner that the ALJ's opinion, taken as a whole, provides a "clear," implicit attack on Dr. Abdallah's lifting and feeling limitations. It is true that the ALJ summarized almost all of Plaintiff's records, but this summary does not, without further explanation, support the rejection of those two limitations. For example, while the ALJ noted that, in October 2009, Plaintiff lifted weights for exercise, (Tr. 29), the cited record does not say how much weight Plaintiff was lifting or how often, (Tr. 637). In fact, it indicates that Plaintiff injured herself lifting "a heavy bag" and was advised to lift less weight. (Tr. 637.) The ALJ also remarked that "[o]n July 20, 2009, the claimant related that her back and neck pain had almost resolved." (Tr. 28.) But Dr. Abdallah was well aware of Plaintiff's pain reduction (*see* Tr. 876), and he nonetheless proscribed feeling tasks and limited lifting to 10 pounds. As a third example, the ALJ implied that, because Plaintiff had been taking no pain medications, her impairments were not as severe as she alleged. (*See* Tr. 34.) But this is a weak inference because it overlooks the fact that Plaintiff was recovering from an addiction to narcotic pain medications, and, therefore, could no longer take those medications. The ALJ's implication may also be based on a faulty premise. Plaintiff only testified that she was no longer taking narcotic medications for pain. (Tr. 64.) And, as recently as February 2010, about two months before the administrative hearing, doctors prescribed Cymbalta (which Drs. Abdallah and Hayward believed aided with neuropathic pain), lidocaine patches, and ibuprofen (at 600 mg every four to six hours). (Tr. 828; *see also* Tr. 832-33.)

Moreover, the ALJ's lengthy fact summary also includes statements that tend to obfuscate any implicit attack. For instance, the ALJ provided that Plaintiff "complain[ed] of dry mouth and felt that her taste and smell were gone." (Tr. 27.) He also stated that Plaintiff's "blood pressure was 120/72 and her heart exhibited regular rate and rhythm." (Tr. 26.) It cannot be that referencing a handful of medical findings that might undermine a treating-source opinion within a summary of scores of others adequately informs a social security claimant why particular, disability-critical findings were rejected. *Cf. Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (noting that "'[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ [s] that do not *comprehensively* set forth the reasons for the weight assigned to a treating physician's opinion.'" (emphasis added) (quoting *Hensley*, 573 F.3d at 267)); S.S.R. 96-2p, 1996 WL 374188, at *5 ("When the determination or decision[] is not fully favorable . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be *sufficiently specific to make clear* to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." (emphases added)).

For all of these reasons, even if substantial evidence ultimately supports the ALJ's decision to reject Dr. Abdallah's opinion, a remand to grant Plaintiff the procedural right of explanation would not be inappropriate. *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely."). Coupled with the Court's concerns about the ALJ's credibility analysis as set forth below, this Court will recommend remand.

24

Dr. Quinn's opinion, however, presents a different story. In particular, Plaintiff's claim that Dr. Quinn is a treating source is belied by the record. In completing his mental functioning assessment of Plaintiff, Dr. Quinn specifically noted that he had only seen Plaintiff on one occasion. (Tr. 673.) Plaintiff and Dr. Quinn therefore had no treating-source relationship at the time he authored the opinion in question. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship. . . . The question is whether [treating source] had the ongoing relationship with [the claimant] to qualify as a treating physician at the time he rendered his opinion."); *see also* 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examinations, such as consultative examinations or brief hospitalizations."). And the Sixth Circuit has held that the treating-source rule only applies, as its name suggests, to treating-source opinions. *See Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, No. 12-5179, 2012 WL 4460654, at *2 (6th Cir. Sept. 27, 2012); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).

Moreover, the Court notes that Dr. Quinn's findings are largely consistent with the ALJ's RFC, which included a limitation of an "inability to understand, remember and carry out more than simple repetitive tasks." (*Compare* Tr. 32 *with* Tr. 671.) And the ALJ also correctly concluded that, while Dr. Quinn provided that Plaintiff was moderately limited in her ability to accept instructions from supervisors and get along with co-workers, Plaintiff in fact denied having any problems

interacting with supervisors or coworkers.  (*See* Tr. 35; *compare* Tr. 672 *with* Tr. 682.)  As such, Plaintiff has not shown any reversible error with regard to the ALJ's treatment of Dr. Quinn's opinion.

### B.  Some of the ALJ's Reasons For Discounting Plaintiff's Credibility Are, In Fact, Not Inconsistent With Plaintiff's Testimony

A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  However, an ALJ must not reject a claimant's "statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . .solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. § 416.929(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186.  In fact, the regulations provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment.  20 C.F.R. § 416.929(c)(3) (listing factors).  And, not unlike the treating-source rule, an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  S.S.R. 96-7p, 1996 WL 374186 at *2.  Moreover, where an ALJ's reasoning underlying his decision to discount a claimant's credibility is partially but not fully flawed, remand  may nonetheless be appropriate.  *Allan v. Comm'r of Soc. Sec.*, No. 10-CV-11651, 2011 WL 2670021 (E.D. Mich. July 8, 2011) (Goldsmith, J.) (citing *Ford v. Astrue*, 518 F.3d 979, 982-983 (8th Cir. 2008)).

In *Allan*, the plaintiff suffered from low-back and leg pain; he testified that he was in

26

"'constant pain' whether standing or sitting[,] . . . that he 'never [found] comfort or ease,'" and "did not believe that he could alternatively sit or stand for an eight-hour day without being able to lie down." 2011 WL 2670024, at *9 (Mar. 17, 2011) *facts adopted by* 2011 WL 2670021 (E.D. Mich. July 8, 2011). The ALJ gave three reasons for discounting the plaintiff's testimony, but the Court found that "only one of the three reasons given by the ALJ for discounting Plaintiff's credibility is supported by substantial evidence. Because the other two are not, the Court remands this matter for further consideration." 2011 WL 2670021, at *2 (citing *Ford v. Astrue*, 518 F.3d 979, 982-983 (8th Cir. 2008)).

In this case, not unlike *Allan*, several of the ALJ's reasons for discounting Plaintiff's credibility do not undermine Plaintiff's testimony. For instance, the ALJ reasoned that Plaintiff volunteers at a communal garden. (Tr. 33.) But, as already discussed, the ALJ did not explain how this is contrary to at least Plaintiff's testimony that she could only lift a couple pounds "occasionally," that she had been instructed (presumably by a physician) not to lift more than eight or nine pounds, and that she could not engage in a number of tasks requiring feeling. (Tr. 61-62.) The ALJ also reasoned that "[d]octors who have examined the claimant do not note that . . . she has reduced strength or sensory deficits." (Tr. 34.) But in March 2009, Dr. Chiodo's exam revealed loss of sensation in Plaintiff's hands (Tr. 901), and an EMG he administered in April 2009 evidenced carpal tunnel syndrome (Tr. 893). In July 2009, Drs. Howell and Abdallah noted that Plaintiff had diminished sensation "along the median nerve of both upper extremities." (Tr. 882.) Without further explanation from the ALJ, it is unclear which evidence he relied upon to conclude that Plaintiff's physicians did not note sensory deficits. The ALJ also reasoned that Plaintiff's x-rays showed no significant degenerative changes. (Tr. 34.) But Dr. Rabideau, the physician who ordered

27

the x-rays, believed that Plaintiff's wrist problems were muscular in nature — not bone or joint related. (*See* Tr. 905; *see also* Tr. 410.) The ALJ also discounted Plaintiff's testimony because, according to the ALJ, "[s]he currently takes no medication for pain." (Tr. 34.) But, as noted, Plaintiff's testimony was that she was no longer taking narcotics for pain because of her addiction (Tr. 64); further, only about two months before the administrative hearing, doctors in fact prescribed Plaintiff pain medications (Tr. 828; *see also* Tr. 832-33).

Given the foregoing, and given this Court's reservations about the ALJ's compliance with the explanatory aspect of the treating-source rule, the Court believes that remand is warranted.

### C.  Plaintiff's Residual Functional Capacity Argument is Moot in Light of this Court's Recommendation to Remand

Plaintiff also argues that the ALJ did not adequately explain how he derived the specific limitations in his residual functional capacity assessment. (Pl.'s Mot. Summ. J. at 10-11.) This argument is premised almost completely on the ALJ's failure to adequately explain why Drs. Abdallah and Quinn's limitations were rejected. It is also closely tied to her claim that the ALJ erred in analyzing her credibility. Therefore, this claim of error is moot in view of the Court's analysis in Part IV.A and Part IV.B.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not adequately explain why he rejected potentially dispositive functional limitations offered by Dr. Abdallah and that a number of the ALJ's reasons for discounting Plaintiff's testimony do not, in fact, undermine her testimony. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 18) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be

28

REMANDED.  On remand, the ALJ should assign a weight to Dr. Abdallah's opinion and provide specific reasons for that weight.  The ALJ should specifically address Dr. Abdallah's lifting and feeling limitations.  Further, the ALJ should provide additional reasons, or elaborate on the existing reasons, for discounting Plaintiff's credibility.[2]

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

---

[2]To the extent that it streamlines the proceedings on remand, the Court notes that Dr. Abdallah's limitations only apply to Plaintiff's functioning after July 2, 2009.  (Tr. 627.)

s/Laurie J. Michelson                    
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  January 10, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 10, 2013.

s/Jane Johnson                    
Deputy Clerk

30